AO 106 (Rev. 04/10) Application for a Search Warrant (Modified: WAWD 10-26-18)

# UNITED STATES DISTRICT COURT
for the
Western District of Washington

```
FILED _____ LODGED
_____ RECEIVED
09/17/2021
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY _____ DEPUTY
```

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
Black iPhone in Black OtterBox case (Device), More fully described in Attachment A

Case No. 3:21-mj-05193

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
A Black iPhone in Black OtterBox case, further described in Attachment A, attached hereto and incorporated herein by reference.

located in the ___Western___ District of ___Washington___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, attached hereto and incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. § 922(g)(3) | Prohibited Possessor |
| 18 U.S.C. § 641 | Theft of Government Property |

☑ See Affidavit of Susannah Lustig, attached hereto and incorporatated herein by reference.

☐ Delayed notice of ___ days (give exact ending date if more than 30 days: ___) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

*Applicant's signature*

Susannah Lustig, Special Agent, National Park Services Branch
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: 09/17/2021

*Judge's signature*

City and state: Tacoma, Washington

Theresa L. Fricke, United States Magistrate Judge
*Printed name and title*

USAO: 2021R00991

# AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANT

I, Susannah Lustig, Special Agent, National Park Service Investigative Services Branch (ISB), being first duly sworn on oath, deposes and says:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Investigative Services Branch of the National Park Service. I have been stationed in the Pacific Field Office since January 2017. Prior to this position I was a uniformed U.S. Park Ranger with the National Park Service for seventeen years. I am a graduate of both the Land Management Basic Law Enforcement Program and Criminal Investigator Training Program at the Federal Law Enforcement Training Center at Glynco, GA. I have a Bachelor of Arts degree from Stanford University.

2. Part of my responsibilities as a Special Agent include investigations involving crimes of violence against intimate partners in National Parks. As a Special Agent, I have led and/or participated in investigations of a wide array of federal criminal violations including assaults, domestic violence, crimes against children, firearms violations, fraud, robberies, and homicide. During these investigations, I have participated in the execution of search warrants and the seizure of evidence of criminal activity.

3. My training includes courses in law enforcement techniques, federal criminal statutes, conducting complex criminal investigations, physical and electronic surveillance techniques, evidence collection techniques, and the execution of search warrants. I am an investigative law enforcement officer of the United States within the meaning of Title 18, United States Code, Section, 2510(7), and empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2243. I am classified and trained as a Federal Law Enforcement Officer with federal statutory arrest authority.

4. The facts set forth in this Affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; review of documents and records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience.

AFFIDAVIT OF SPECIAL AGENT LUSTIG
USAO# MJ21-05185 - 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

5.     The facts set forth in this Affidavit occurred within the City of Port Angeles, Washington, and Olympic National Park. Olympic National Park is an area of federally owned public land administered by the National Park Service. Olympic National Park is an area of special maritime and territorial jurisdiction of the United States. Olympic National Park is located within the Western District of Washington.

6.     Because this Affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits and instrumentalities will be found on the SUBJECT DEVICE in violation of the following laws of the United States:

   a) *Title 18 U.S. Code 922(g)(3): It shall be unlawful for any person to possess a firearm or ammunition who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)).*
   b) *Title 21 U.S. Code § 844(a): It shall be unlawful for any person knowingly or intentionally to possess a controlled substance.*
   c) *Title 18 U.S. Code § 1362: Whoever willfully or maliciously injures or destroys any of the works, property, or material of any radio, telegraph, telephone or cable, line, station, or system, or other means of communication, operated or controlled by the United States, or used or intended to be used for military or civil defense functions of the United States, whether constructed or in process of construction, or willfully or maliciously interferes in any way with the working or use of any such line, or system, or willfully or maliciously obstructs, hinders, or delays the transmission of any communication over any such line, or system, or attempts or conspires to do such an act.*
   d) *Title 18 U.S. Code § 1855: Whoever, willfully and without authority, sets on fire any timber, underbrush, or grass or other inflammable material upon the public domain or upon any lands owned or leased by or under the partial, concurrent, or exclusive jurisdiction of the United States,*

AFFIDAVIT OF SPECIAL AGENT LUSTIG
USAO# MJ21-05185 - 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

e) *Title 18 U.S. Code § 1853: Whoever unlawfully cuts, or wantonly injures or destroys any tree growing, standing, or being upon any land of the United States which, in pursuance of law, has been reserved or purchased by the United States for any public use.*

f) *Title 18 U.S. Code § 113(a)(4): Whoever, within the special maritime and territorial jurisdiction of the United States assaults by striking, beating, or wounding.*

g) *Title 18 U.S. Code § 226(a)(1): A person who travels in interstate or foreign commerce or enters or leaves Indian country or is present within the special maritime and territorial jurisdiction of the United States with the intent to kill, injure, harass, or intimidate a spouse, intimate partner, or dating partner, and who, in the course of or as a result of such travel or presence, commits or attempts to commit a crime of violence against that spouse, intimate partner, or dating partner.*

h) *Title 18 U.S. Code § 641: Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof.*

## IDENTIFICATION OF THE SUBJECT DEVICE TO BE EXAMINED

7. The SUBJECT DEVICE is a black iPhone cellular telephone, contained within a black Otterbox cellular telephone case, with silver Torros Pop Socket affixed to the rear and containing a white SD card, bearing serial number 89148 0000 58061 98230.

8. The SUBJECT DEVICE is currently in the lawful possession of the National Park Service. It came into the National Park Service's possession during the search incident to arrest of Chapman on August 31, 2021.

9. The SUBJECT DEVICE is currently in storage at the Olympic National Park evidence storage room, located at 600 East Park Avenue in Port Angeles, Washington. In my training and experience, I know that the SUBJECT DEVICE has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the SUBJECT DEVICE first came into the possession of the National Park Service.

AFFIDAVIT OF SPECIAL AGENT LUSTIG
USAO# MJ21-05185 - 3

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

10. The warrant would authorize the forensic examination of the SUBJECT DEVICE for the purpose of identifying electronically stored data particularly described in Attachment B.

### FACTS IN SUPPORT OF PROBABLE CAUSE

11. At about 2:00 AM on August 29, 2021, CALEB CHAPMAN (hereinafter, CHAPMAN) contacted R.H. at R.H.'s home and gave R.H. a handwritten note that discussed his grievances with the White House, his difficulty obtaining ammunition, and a pending "revolution" starting on the Olympic Peninsula and in Texas. At that time CHAPMAN was armed with an AR-15 rifle and a handgun that was concealed in his waistband.

12. At about 4:30 AM, the Peninsula Emergency Communications Center (PENCOM) received a 911 telephone call reporting a wildfire burning in Olympic National Park, about one mile south of the intersection of the Hurricane Ridge Parkway and Mt. Angeles Road. The Clallam County Fire Department and US Park Ranger Dan Hall responded to this wildfire and extinguished it. A Washington Department of Natural Resources wildland fire investigator responded to this fire and conducted the fire origin and cause investigation. Based upon the fire investigator's preliminary fire origin and cause investigation, any natural or accidental causes of this fire where excluded. He believed the fire was human caused and intentionally set.

13. Later that morning, PENCOM received a report from a National Park Service (NPS) employee that a tree had been cut down and was blocking Deer Park Road within the boundaries of Olympic National Park. Deer Park Road leads to Deer Park Campground and ends just below the summit of Blue Mountain. Park Rangers located one Douglas Fir tree that had been felled but had been moved to the road shoulder by an NPS Contractor, and a second Douglas Fir tree that had been cut as if it was intended to be felled but was still standing.

AFFIDAVIT OF SPECIAL AGENT LUSTIG
USAO# MJ21-05185 - 4

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

14. At about 10:09 AM, US Park Ranger Grego located a white Ford F-250 extended cab pick-up truck parked at the end of the Deer Park Road. This truck was displaying Washington license plate C99383B and was registered to Ryan Williams.

15. Ranger Grego contacted the adult female in the truck who was later identified as A.J. A.J. told Ranger Grego that she was CHAPMAN's girlfriend, and that CHAPMAN was armed with multiple firearms somewhere near them on Blue Mountain.

16. Rangers evacuated the Deer Park campground, trailheads, and road areas. For the next few hours, NPS Rangers, Port Angeles Police Officers, Clallam County Sheriff's Deputies and Federal Bureau of Investigations (FBI) Special Agents (SA) attempted to locate CHAPMAN using exigent cellular telephone location data (pings), and a police dog.

17. On August 29, 2021, A.J. was interviewed by law enforcement. A.J. said that CHAPMAN used methamphetamine and began acting erratically sometime after midnight on August 29, 2021. At approximately 2:00 a.m., after dropping his kids off with his brother, CHAPMAN and A.J. went to R.H.'s house to deliver the note CHAPMAN had written to R.H.

18. After speaking with R.H. and delivering his note to at least one other personal acquaintance, CHAPMAN and A.J. drove to the Deer Park campground in the Olympic National Park.[1]

19. On their way to the campground CHAPMAN stopped the truck and walked into the woods. Shortly thereafter A.J. saw embers from a fire near CHAPMAN's location. Upon his return to the truck, CHAPMAN smelled of gasoline.[2]

---

[1] While at the Campground, a witness, D.R., interacted with A.J. and CHAPMAN. D.R. told investigators that it appeared as if A.J. was "strung out," indicating that she might be under the influence of drugs.

[2] While A.J. described the fire as being on the Deer Park Road, the fire is within the first mile on the Hurricane Ridge Parkway. It is believed A.J. incorrectly reported the name of the road where the wildfire occurred as Deer Park Road instead of Hurricane Ridge Parkway.

AFFIDAVIT OF SPECIAL AGENT LUSTIG
USAO# MJ21-05185 - 5

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

20. While traveling up Deer Park Road towards the campground, A.J. indicated CHAPMAN stopped the truck multiple times. A.J. observed CHAPMAN exit the truck and she heard a chainsaw being operated. It was dark and she was unsure of what he was doing. This activity described by A.J. is consistent with the location of the felled tree observed by NPS employees.

21. At approximately 6:00 a.m. on August 29, A.J. and CHAPMAN arrived at the Deer Park Campground area. According to A.J., CHAPMAN became increasingly upset. CHAPMAN told A.J. that she was going to die because of the "revolution." CHAPMAN told A.J. that he was never going to see his children again and that this was his "last day." A.J. stated that she was able to surreptitiously dial 911 from a cell phone during this time. A.J. did not indicate if the call was placed from A.J.'s phone or CHAPMAN's. CHAPMAN became aware of the phone call and grew enraged, telling A.J. that she didn't know what she had just done.

22. While arguing with A.J., CHAPMAN threw a full and unopened soup can at A.J., hitting her and causing a laceration to her leg. During the investigation, Ranger Grego observed a laceration on A.J.'s leg. A.J. reported that CHAPMAN then grabbed her by the head and hit her head, repeatedly, against the car seat while telling A.J. to "shut up." A.J. then observed CHAPMAN leave the truck and walk into the woods while yelling and screaming. A.J. stated that when CHAPMAN left, he was wearing a black colored tactical vest, a sleeveless shirt, jeans, and was armed with a semi-automatic rifle, a shotgun, and multiple handguns.

23. A.J. told agents that CHAPMAN had been talking about a "revolution" and he believes that there is going to be an armed conflict with the government. A.J. told investigators that she did not believe that CHAPMAN would harm the public but believed he will act violently towards law enforcement if he feels threatened. A.J. also believed that CHAPMAN has additional methamphetamine in his possession.

AFFIDAVIT OF SPECIAL AGENT LUSTIG
USAO# MJ21-05185 - 6

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

24. At about 3:00 PM, the Olympic National Park radio communications site (radio repeater) located at summit of Blue Mountain suddenly stopped functioning. This radio repeater is owned by the National Park Service. It is used by Olympic National Park for emergency response, public safety, and administrative radio communications.

25. On August 31, 2021, at approximately, 9:00 PM, CHAPMAN was located by an Unmanned Aircraft System (UAS), commonly referred to as a "drone." CHAPMAN was inside the Ford F-250 pick-up truck that was still parked at the Blue Mountain Summit parking lot. The UAS was remotely operated by law enforcement and was being used to perform a reconnaissance of the area. CHAPMAN fired at the UAS with a shotgun. The firearm used was a modified Remington, Model 870, pump-action shotgun with an overall length of less than 26 inches as the stock had been removed.

26. Law enforcement officers were ultimately able to contact CHAPMAN on his cell phone and were eventually able to negotiate his surrender. At about 9:51 PM, CHAPMAN surrendered to FBI Agents and was placed under arrest.

27. During the search incident to arrest of Chapman's person, FBI Agents seized the SUBJECT DEVICE, a black iPhone cellular telephone in a black Otterbox cell phone case.

28. The Remington 870 shotgun that CHAPMAN used to shoot at the drone was also seized as evidence. After CHAPMAN was arrested, NPS and FBI officers seized as evidence four semi-automatic pistols, two semi-automatic rifles and one 20-gauge pump action shotgun from areas adjacent to CHAPMAN's arrest and in other areas in the Park that were described by CHAPMAN. These firearms were transferred to the Clallam County Sheriff's Office for evidence storage.

29. On September 1, 2021, NPS Special Agents searched the area around the Blue Mountain parking lot, which had been closed since the law enforcement incident began on August 29, 2021. An NPS Information Technology (IT) Specialist accompanied them.

AFFIDAVIT OF SPECIAL AGENT LUSTIG
USAO# MJ21-05185 - 7

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

30. The white Ford F-250 used by CHAPMAN was still parked in the parking lot. On the ground directly next to the driver's door, an Agent found one expended Federal brand 12-gauge shotgun shell and one unexpended Federal 12-gauge shotgun shell. Law enforcement officers observed two Stihl chainsaws and multiple boxes of ammunition in plain view in the white Ford F-250.

31. Agents then searched the Blue Mountain radio repeater site with the assistance of the NPS IT Specialist, who is a subject matter expert regarding NPS radio repeaters. They determined that two lower screws on the fiberglass door of the repeater had been pried up from the door frame and the metal hasp on the door and door frame was missing its padlock.

32. When the IT Specialist examined the radio repeater electronical components, he noted that radio repeater power cable and the transmitting antenna cable had been removed from the radio repeater. The plastic ring on the power cable that screws into the radio repeater was broken and needed to be replaced in order to return the radio repeater into service.

33. NPS Agents searched the general area around the summit of Blue Mountain parking lot and found two caches of CHAPMAN's items that had been left on the Blue Mountain "rainshadow trail." At these locations, agents found several hundred live ammunition cartridges in various calibers and quantities, a loaded Smith & Wesson MP 9mm semi-automatic pistol, radio repeater electrical components, an Olympic National Park radio frequency list, a radio microphone, food and water, knives, general survival equipment, a brown leather journal with CHAPMAN's photograph on it, personal items and identification cards belonging to CHAPMAN, A.J., and other individuals, along with a baggie containing a white crystalline substance believed to be narcotics.

34. When performing records checks of the Smith & Wesson MP .40 caliber semi-automatic pistol, serial number HVN7197, that was seized in the area surrounding CHAPMAN at the time of his arrest, Port Angeles Police Sergeant Josh Powless

AFFIDAVIT OF SPECIAL AGENT LUSTIG
USAO# MJ21-05185 - 8

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

determined this pistol was reported as stolen to the Port Angeles Police Department in 2017.

**TECHNICAL TERMS**

35. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

AFFIDAVIT OF SPECIAL AGENT LUSTIG
USAO# MJ21-05185 - 9

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store

AFFIDAVIT OF SPECIAL AGENT LUSTIG
USAO# MJ21-05185 - 10

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

36. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at https://www.apple.com/iphone/, I know that the SUBJECT DEVICE has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

37. Based on my knowledge, training, and experience, I know that digital devices and electronic storage media can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device used to access the Internet. This information can sometimes be recovered with forensic tools.

38. *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the SUBJECT DEVICE was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the SUBJECT DEVICE because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

AFFIDAVIT OF SPECIAL AGENT LUSTIG
USAO# MJ21-05185 - 11

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

b. As explained herein, information stored within electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within electronic storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. Storage media activity can also indicate how and when the computer or storage media was accessed or used.

c. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the device user.

d. Information stored within the SUBJECT DEVICE may provide relevant insight into the device user's state of mind as it relates to the offense under investigation. For example, information within the device may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the device or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

AFFIDAVIT OF SPECIAL AGENT LUSTIG
USAO# MJ21-05185 - 12

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

e. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

f. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

g. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

39. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## DIGITAL DEVICES AS INSTRUMENTALITIES OF THE CRIMES

40. The evidence requested from the SUBJECT DEVICE may help establish motive, location due to the GPS, and internet search history related to the pertinent crimes. It may also provide corroboration of A.J.'s description of calling 911 from a phone just prior to the assault.

## SEARCH TECHNIQUES

41. Based on the foregoing, and consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, the warrant I am applying for will permit imaging or

AFFIDAVIT OF SPECIAL AGENT LUSTIG
USAO# MJ21-05185 - 13

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

otherwise copying all data contained on the SUBJECT DEVICE and will specifically authorize a review of the media or information consistent with the warrant.

42. In accordance with the information in this affidavit, law enforcement personnel will execute the search of the SUBJECT DEVICE pursuant to this warrant as follows:

    a. **Securing the Data**

In order to examine the ESI in a forensically sound manner, law enforcement personnel with appropriate expertise will attempt to produce a complete forensic image, if possible and appropriate, of the SUBJECT DEVICE. Law enforcement will only create an image of data physically present on or within the SUBJECT DEVICE. Creating an image of the SUBJECT DEVICE will not result in access to any data physically located elsewhere. However, a SUBJECT DEVICE that has previously connected to devices at other locations may contain data from those other locations.

    b. **Searching the Forensic Images**

Searching the forensic images for the items described in Attachment B may require a range of data analysis techniques. In some cases, it is possible for agents and analysts to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant, and law enforcement may need to conduct more extensive searches to locate evidence that falls within the scope of the warrant. The search techniques that will be used will be only those methodologies, techniques and protocols as may reasonably be expected to find, identify, segregate and/or duplicate the items authorized to be seized pursuant to Attachment B to this affidavit.

//
//
//

AFFIDAVIT OF SPECIAL AGENT LUSTIG
USAO# MJ21-05185 - 14

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

//
//

## CONCLUSION

43. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the SUBJECT DEVICE described in Attachment A to seek the items described in Attachment B.

44. This warrant is being submitted via reliable electronic means under Fed. R. Crim. P. 4.1 & 41(d)(3).

Respectfully submitted,

*[signature]*

Susannah Lustig
Special Agent
National Park Service

The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone on this 17th day of September, 2021.

*[signature]*

THERESA L. FRICKE
UNITED STATES MAGISTRATE JUDGE

AFFIDAVIT OF SPECIAL AGENT LUSTIG
USAO# MJ21-05185 - 15

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT A**
**ITEMS TO BE SEARCHED**

iPhone, Black in color, contained within an OtterBox, also Black in color, with a Torros Pop Socket affixed to the rear and containing an SD card, White in color, bearing serial number 89148 00000 58061 98230. (Device)

  

**ATTACHMENT B**
**ITEMS TO BE SEIZED**

1. All records on the Device described in Attachment A that relate to violations of 18 USC § 922(g)(3)-Prohibited Possessor, 18 USC § 641-Theft, 21 USC § 844 (a)-Simple Possession, 18 USC § 1362-Communications Lines, Stations or Systems, 18 USC § 32-Destruction of Aircraft, 18 USC § 1855-Timber Set a Fire, 18 USC § 113(a)(4)-Assault by Striking, Beating or Wounding, 18 USC §2261(a)(1)-Interstate Domestic Violence, 18 USC § 1853-Trees Cut or Injured and involve CALEB JESSE CHAPMAN since March 01, 2021 to August 29, 2021 including:

   a. Call logs, SMS (Text) messages, Digital images, Location data, describing

   b. types, amounts, and prices of drugs purchased or trafficked as well as dates, places, and amounts of transactions;

   c. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

   d. any information recording CHAPMAN's schedule or travel from March 01, 2021 to the present;

2. Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

   a. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

   As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.